UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 21-CR-10099-NMG |
| ARMANI MINIER-TEJDA, a/k/a "Shotz," | |
| Defendant | |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**

The Defendant was the leader of a drug trafficking operation ("DTO") that trafficked kilograms of cocaine, fentanyl, and methamphetamine from Massachusetts to Maine. The DTO also brought dozens of firearms from Maine to Massachusetts, and used them here to protect themselves, their proceeds, and drug supply, and to shoot at rivals and those standing in their way.

The Defendant's DTO did not stand on its own. It operated under the umbrella of the Tiny Rascal Gangsters, a/k/a "TRG," a national street gang known for its violence. The firearms obtained by the DTO and its gang members were put to use – this Court heard of the Defendant's participation in six shootings. The Defendant and his violent gang brought multiple machineguns – actual weapons of war - to the streets of Massachusetts, and used one of them to spray a housing project with bullets because of a social media video. An uncharged member of the Defendant's drug conspiracy, and fellow TRG members committed a brazen drive-by murder of persons they believed were rival Trinitarios gang members. A crime that the Defendant attempted to commit with the same TRG member twice before.

The government recommends a sentence of 360 months for Counts One and Two, followed by the mandatory consecutive 360 months on Count Three, which is the low-end of the guideline sentence range ("GSR"). The government's recommended sentence properly reflects the outrageous quantity of drugs and acts of violence that the Defendant participated in, the need to specifically deter the Defendant, and the clarion message that this Court should send to other members of street gangs about the penalties that they will face for drug and gun crimes, especially those involving shootings and the use of machineguns. This term of imprisonment is sufficient, but no greater than necessary, to accomplish the goals of sentencing.

## PROCEDURAL POSTURE AND THE ADVISORY SENTENCING GUIDELINES[1]

On June 28, 2023, the Defendant was found guilty as charged after trial. The Defendant stands convicted of the following: Conspiracy to Manufacture, Distribute and to Possess with Intent to Distribute 400 Grams or More of Fentanyl, 500 Grams or More of Methamphetamine, Cocaine, and Other Controlled Substances in violation of 21 U.S.C. §§ 846, 841(b)(1)(A); Conspiracy to Use and Carry a Firearm During and in Relation to, and Possess a Firearm in Furtherance of, a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(o); and Use and Carrying, Brandishing and Discharge of a Firearm During and in Relation to, and Possession of a Firearm in Furtherance of, a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(l)(A) & (c)(B)(ii).  By operation of Counts One and Three, the Defendant faces a mandatory minimum sentence of at least 40-years in prison.

## I.    CALCULATION OF GUIDELINE SENTENCING RANGE

The government agrees with Probation's calculation that the total offense level is 40, but disagrees with the calculation of the Defendant's criminal history as III. Probation has calculated a GSR of 360 to life.

### A.    Offense Level

As Probation has noted, Count One and Count Two are grouped for guideline calculation purposes, because one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the count(s). USSG §3Dl.2(c). Count Three is also not subject to the grouping rules. See USSG § 2K2.4(b) ("if the defendant, whether or not convicted of another crime, was convicted of violating section 924(c) or section 929(a) of title 18, United States Code, the guideline sentence is the minimum term of imprisonment required by statute.").

*Base Offense Level*:                36, because the Defendant is responsible for at least 30,000 kilograms but less than 90,000 kilograms, under USSG § 2D1.1(c)(2)

---

[1] References are as follows: docket entries in this case by entry number (ECF #_); presentence investigation report (PSR) by paragraph (PSR ¶_) or page (PSR, p. _); and trial transcripts by date and page (Tr. _, p. _).  The U.S. Probation Department is referred to as "Probation."

*Leadership Adjustment*:  +4, because the Defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive, under USSG § 3B1.1(a)

<u>*Total Offense Level:*</u>  40

### B.   Criminal History

Probation has calculated the Defendant's criminal history category to be III, based on five criminal history points. *See* PSR ¶¶255-263. The government believes that the Defendant's proper CH score should be 10.[2] The government notes that its objection in this instance is largely academic given the offense level and mandatory minimums at issue.

### C.   Guidelines Sentencing Range

Criminal History Category:      5 points (PSR ¶262), Category III (PSR ¶263)
Guidelines Sentence Range:      360 months to life on Counts One & Two
Mandatory Statutory Imprisonment:  120 months minimum on Count One

                                360 months imposed consecutively to Count One (USSG § 2K2.4(b))[3]

<u>Total Guidelines Sentence Range:</u>  360 months to life, +360 months (PSR ¶¶298-301)

<u>**ARGUMENT**</u>

## I.   APPLICATION OF THE SENTENCING GUIDELINES

The government bears the burden of proving the facts "supporting an enhancement by a preponderance of the evidence." *United States v. Damon*, 595 F.3d 395, 399 (1st Cir.2010). In finding the facts supporting an enhancement, "[a] sentencing court is entitled to rely on circumstantial evidence and draw plausible inferences therefrom." *United States v. Marceau*, 554 F.3d 24, 32 (1st Cir. 2009); *United*

---

[2] This appears to be based on Probation not scoring a number of DYS commitments imposed on separate cases arising from separate incidents. Probation has taken the position that because the sentence for these distinct offenses was imposed on the same day and were served concurrently that they should not score separately. *See* PSR ¶¶255 (zero CH points despite DYS commitment beyond 60 days), 256 (zero CH points despite DYS commitment beyond 60 days), 258 (1 CH point despite DYS commitment beyond 60 days). The government objects to this practice as it is contrary to the comments and definition of prior sentences set forth in the Guidelines. *See* USSG § 4A1.2(a)(2) ("Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense).") & n. 11.

[3] <u>See</u> 18 U.S.C. § 924(c)(1)(A), (D).

*States v. Paneto*, 661 F.3d 709, 716 (1st Cir. 2011).

A sentencing court "must take pains to base [its] sentencing judgments upon reliable and accurate information." *United States v. Tavano*, 12 F.3d 301, 305 (1st Cir. 1993). Thus, it may take into account "any information that has sufficient indicia of reliability." *United States v. Díaz-Arroyo*, 797 F.3d 125, 130 n.3 (1st Cir. 2015). In doing so, it has "wide discretion to decide whether particular evidence is sufficiently reliable to be used at sentencing." *United States v. Cintrón-Echautegui*, 604 F.3d 1, 6 (1st Cir. 2010).

The Defendant makes four objections to the Offense Level calculation largely based upon a claim that the relevant conduct is not supported by sufficient evidence or the information is outside of the scope of relevant conduct. Those objections specifically were to the following:

> Possession of a Machine Gun: contending the "assertion that he possessed a machinegun and/or selector switch at any time . . . . is not supported by the credible evidence."

> Shootings and Violence: that evidence of the shootings and violence should not be included because it "depended almost entirely upon unreliable testimony and statements of cooperating witnesses."

> Drug Quantities: "the drug quantities are not supported by the credible evidence, they depend in large part upon the unreliable testimony and statements of cooperating witnesses, and the calculations failed to take account of the likely doublecounting of drugs Mr. Tejada received and later distributed."

> Leadership Role: "evidence did not reliably establish" his leadership of the DTO, five or more participants, or the extent.

The government addresses each claim in turn.

### A.    Factual Dispute Regarding Machine Gun

The Defendant's objection related to the inclusion of the machinegun is readily disposed-of. There was ample evidence to prove the Defendant's possession of a machinegun beyond a reasonable doubt, as the jury in fact determined on the specific verdict form. The Defendant filmed himself holding the machinegun recovered in the case, wearing a shirt he purchased, and sent that video over Snapchat from his Snapchat account with a number of other selfie-videos (PSR ¶¶199-200). The Defendant discussed the fact that his runner, Jaiir Coleman, whom he trusted the most, had been arrested with a Glock "high capacity with automatic on it" in text messages with one of the dealers he supplied. *See* PSR ¶¶201-206. Other videos were

also introduced that captured Coleman handling other machineguns that the Defendant's DTO had acquired (PSR ¶¶193-206).

As if that were not enough, CW-1 and CW-14 testified extensively concerning how the DTO, including Coleman, Carlisle, and the Defendant had obtained the machineguns to protect their DTO. *See* PSR ¶¶174-180, 193-195. This aspect of the offense conduct was proven far beyond a reasonable at trial, and the objection should be overruled.

### B.    Factual Dispute Regarding Shootings

The Defendant next objects to the evidence of the shootings, which he claims was predicated solely upon the testimony of CW-14, and therefore cannot be considered by the Court at sentencing. Not only is this not accurate – CW-1 described the Defendant admitting to three shootings, and CW-14's testimony was corroborated by the digital evidence, videos, images, cell site location information, and other cooperating witness testimony – but he also misapprehends the scope and nature of "relevant conduct" under the Guidelines. To the extent this Court is required to make an individual credibility determination, it should credit the testimony of CW-1 and CW-14 regarding the shootings based on the overall corroboration that the shooting testimony was subject to at trial.

The rules of evidence at sentencing are "considerably less rigorous" than those at trial and permit the Court to consider any evidence with "'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Cintrón–Echautegui*, 604 F.3d 1, 6 (1st Cir.2010) (quoting *United States v. Zapata*, 589 F.3d 475, 485 (1st Cir.2009)). Accordingly, the sentencing court may rely upon "'virtually any dependable information,'" including statements which have not been subjected to the crucible of cross-examination and information appearing in a presentence report. *Id*. When the court hears live testimony subject to cross-examination, any "plausible credibility determinations cannot be disturbed on appeal." *United States v. Soto–Beníquez*, 356 F.3d 1, 52 (1st Cir. 2003).

In this case, multiple witnesses testified to the numerous shootings that the Defendant had committed with Coleman, Carlisle, and Ulysse, who were all TRG members themselves. This included the following shootings (PSR ¶¶207-237):

- A shooting in the area of Curwin Circle in Lynn, in 2019, where the Defendant, Coleman, and Carlisle fired at Trinitarios ("Shooting One");

- A shooting taking place from a vehicle on Western Avenue in Lynn, at approximately the same time as the Curwin Circle shooting, where the Defendant, Coleman, and Carlisle fired at Trinitarios who had fired at them ("Shooting Two");

- A shooting taking place in Boston in the fall or winter of 2019, where the Defendant and Coleman fired at persons who had fired at them ("Shooting Three");

- A shooting taking place in Somerville in May 2020, where the Defendant, Coleman, and Ulysse fired at rival gang members ("Shooting Four"). This shooting was proven at trial through the testimony of multiple witnesses[4]. Following this shooting, they took the vehicle to the Defendant's residence to clean it. The witness testimony was detailed and mutually corroborative on key points.

- A shooting taking place in Cambridge in July 2020, involving the use of a fully automatic handgun, where the Defendant and Coleman fired thirty (30) rounds into a crowd of people gathered outside of a housing project in response to a Facebook live video that called the Defendant and Coleman rats ("Shooting Five"). This shooting was proven at trial through the testimony of CW-14, cell site location information, and physical evidence at the scene that was consistent with multiple offensive shooters firing northerly into the gathered crowd.

- A shooting taking place in Brockton in the summer of 2020, where the Defendant and Coleman fired at persons who were coming at them aggressively due to the jewelry they were wearing ("Shooting Six");

In this case, the testimony of CW-14 and CW-1 at trial is sufficient on its own to prove these incidents by preponderant evidence. *See United States v. Torres-Galindo*, 206 F.3d 136, 139-40 (1st Cir. 2000) (uncorroborated testimony of cooperating accomplice may sustain conviction provided testimony is not facially incredible). These cooperating witnesses described their own participation in shootings with the Defendant and admitted to their participation under oath, *inter alia*, at grand jury proceedings, at their plea hearings, and at trial. CW-1 described the Defendant stating that he had committed three shootings,[5] which is consistent with CW-14's testimony. On its own, their credible, and interlocking testimony is sufficient to support these facts by a preponderance of the evidence. *See United States v. Doe*, 741 F.3d 217, 235-236

---

[4] CW-1 testified to not knowing if the Defendant fired during this incident, but identified Ulysse and Coleman as firing; CW-14 testified that the Defendant, Coleman, and Ulysse fired.

[5] *See* Tr. 6/13/23, p. 208-209 ("Probably say, like, off the top of my head that I can think of right now I'll say maybe three."). Given the timetable of the six shootings that the Defendant committed, only three shooting would have taken place prior to CW-1's incarceration.

(1st Cir. 2013).

Furthermore, at least two of the shootings described by CW-14 were proven through cross-corroborating evidence – the May 2020 shooting by CW-1 who testified to largely the same facts, except CW-1 did not know if the Defendant fired;[6] and the July 2020 shooting was corroborated by cell site location information placing the Defendant in the vicinity of the shooting before and after, and physical evidence from the scene, all consistent with CW-14's testimony of there being two offensive shooters. *See United States v. Mills*, 710 F.3d 5, 16 (1st Cir. 2013) (cross-corroborating evidence).

Significantly, the Defendant also described his willingness to shoot in furtherance of the drug conspiracy in writing. The Defendant specifically told CW-6 that he would have shot and inferably killed the people who robbed CW-6, if he had been present (PSR ¶189). The Defendant also discussed his plan to retaliate against the rival gang members who stole his chain (PSR ¶46).

Moreover, the underlying premise of CW-14's testimony as to the shootings – that TRG obtained guns to shoot at rivals and protect themselves; and that the Defendant, Carlisle, Ulysse, and Coleman in fact did fire at rivals on multiple occasions – is wholly supported by the circumstances. The corroborating evidence in fact was largely captured on videos that they filmed during the conspiracy, such as the videos of Defendant, Carlisle, Coleman, and Ulysse, shooting the firearms in Maine to become familiar with the firearms and improve their aim during the shootings,[7] and brandishing those weapons in social media videos directed toward the rival gang members. See PSR ¶¶159-200. Not only did they shoot, and shoot dozens of rounds, but TRG also shot to kill. Carlisle and other TRG members were proven to have committed a murder in a separate trial (PSR ¶¶232-237). Consequently, CW-14's testimony that the Defendant, Carlisle and Coleman would actually fire these weapons at others in these other incidents was well-corroborated and credibly established during the trial testimony. In fact, the Defendant in fact boasted about his willingness

---

[6] *See* Tr. 6/13/23, p. 202-206.

[7] *See* PSR ¶¶61-64. This practice was important, as CW-1 specifically emphasized during a particularly heated point of cross-examination about the familiarity with the firearms they would then use in the street to shoot rivals. As CW-1 noted at one point in his testimony, during one shooting in which CW-1 participated and the Defendant was present, CW-1 was not familiar with   a firearm's trigger reset mid-shooting, rendering the firearm all but inoperable.

to shoot others in text messages. This is far beyond preponderant evidence. As a result, the government asks the Court to credit the testimony of CW-1 and CW-14 as to the Defendant's participation in the shootings, and overrule the Defendant's objection.

### C.    The July 4, 2020, Murder

The Defendant next objects to the inclusion of evidence regarding the murder that was committed by unindicted coconspirator Marcus Carlisle, on the basis that "there is no evidence in the record that Mr. Tejada participated in the murder in any respect." While the Defendant was not present in the vehicle for the drive-by shooting and did not personally pull the trigger, this murder is properly considered by the Court as "relevant conduct" under the guidelines, because the murder of a rival gang member by a coconspirator during the course of the conspiracy was reasonably foreseeable to the Defendant.

As the sentencing guidelines make clear, relevant conduct includes:

> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were--
>
> > (i) within the scope of the jointly undertaken criminal activity,
> >
> > (ii) in furtherance of that criminal activity, and
> >
> > (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

USSG § 1B1.3.  The murder committed by Carlisle, as well as other TRG members who were part of the drug conspiracy, falls squarely within the reasonably foreseeable conduct of his coconspirators.  Given his longstanding membership, leadership role in TRG, and participation in two prior shootings of Trinitarios with Carlisle, the Defendant cannot credibly claim that he did not anticipate TRG gang members would commit a murder. Stated differently, this murder was plainly foreseeable to the Defendant —indeed, based on his two past shootings of Trinitarios involving one of the same shooters (Carlisle) who successfully murdered one of their long-standing rivals.

First, the jointly undertaken criminal activity was a lucrative interstate drug trafficking organization that obtained firearms, practiced with them, and conducted shootings of rival gang members to further and protect their drug trafficking organization. As CW-1, CW-6, and CW-14 described (and the Defendant's text messages make clear), firearms were tools of this drug organization and their use – that is their possession, use, and carrying, and discharge was within the scope of the activity.  The Defendant also did not mince words on this point.  In text messages, the Defendant described the guns he had, the guns other members had, directed one of his dealers to carrying a gun like he did, and specifically told CW-6 that he would have killed the persons who tried to rob CW-6 of their drug proceeds if he would have been present. *See* PSR ¶189.  There is no question that murder through the use of the DTO's firearms was within the scope of the jointly undertaken criminal activity.

Second, this murder was in furtherance of that jointly undertaken criminal activity. Carlisle targeted the rivals of TRG– the Trinitarios.  These rivals posed a threat to the TRG drug conspiracy – they had shot at members of the drug conspiracy in the past, and the TRG members obtained firearms specifically to protect themselves and act offensively against the Trinitarios who stood in their way. Moreover, promptly after the murder, Carlisle reported it to the Defendant and Coleman – this murder was a point of pride for this conspiracy, not some aberrant act.  The evidence about the TRG response to the murder charges against Carlisle also shows how expected and integral this murder was to the overall TRG drug conspiracy. The members of this conspiracy were going to gather funds through selling drugs in order to hire a lawyer for Carlisle. Another TRG member discussed how they had pressured a witness against Carlisle to not testify and both the Defendant and Oth had the grand jury testimony of that witness from the murder investigation on their phones.

Third, this murder was reasonably and actually specifically foreseeable to the Defendant. The Defendant, Ulysse, Carlisle, and other TRG members practiced shooting firearms a few weeks before the murder in order to improve their aim, establish familiarity with the weapons, and increase the shooters' overall lethality. *See* PSR ¶¶61-65. As multiple witnesses testified, and the videos made clear, TRG obtained the guns in order to use them to protect their drug operation and strike offensively at rival. *See* PSR ¶¶185,

186-192.  Beyond this, Carlisle was not some rogue actor in the conspiracy, committing shootings on his own accord -- he was a leader in the DTO, and the Defendant, Carlisle, and Coleman were willing to shoot and kill the Trinitarios on two prior occasions, where they simply missed their mark. *See* PSR ¶¶208-211. That Carlisle would undertake another shooting with TRG members targeting the Trinitarios, was not just foreseeable to the Defendant, but, as CW-1 and CW-14 explained at trial, was actually expected. They trained and practiced with the firearms.  It therefore was no surprise that after conducting target practice in rural Maine while on a drug run, Carlisle and the other TRG members struck five persons (gang rivals) during a drive-by shooting days later, with one suffering fatal injuries.

That Carlisle would again make good on the conspiracy's ongoing violence is foreseeable, and the murder, in context, was an escalation that is not excessive for what the conspiracy was capable of. Just two days before Carlisle's contribution, the Defendant and Coleman unloaded thirty rounds at a housing project, using a fully automatic weapon.  This murder stamped the TRG drug conspiracy's reputation for violence, benefitted the gang and the DTO, and took place during the central time of the TRG drug and gun conspiracy. Consequently, the murder was within the jointly undertaken criminal activity, and was entirely foreseeable to the Defendant.  Therefore, the murder committed by a leader and member of the drug conspiracy, in this context of continued violence and shootings, is properly considered as part of the relevant conduct.

### D.    Drug Quantity

Probation properly calculated the drug weight to be over 45,000 kg of converted drug weight. *See* PSR ¶245.  In short, the "government need only prove drug amounts by a preponderance of the evidence," and this evidence far exceeds preponderant. *United States v. Kinsella*, 622 F.3d 75, 86 (1st Cir. 2010); *United States v. Rodriguez*, 525 F.3d 85, 107 (1st Cir. 2008); *United States v. Rivera–Maldonado*, 194 F.3d 224, 228-29 (1st Cir.1999) (noting that a district court's quantity finding must have "demonstrable record support" and be based on reliable evidence).

Under the guidelines, a defendant is responsible for "drugs he personally handled or anticipated handling, and, under the relevant conduct rubric, for drugs involved in additional acts that were reasonably foreseeable by him and were committed in furtherance of the conspiracy." *United States v. Sepulveda*, 15

F.3d 1161, 1197 (1st Cir. 1993) (citing *United States v. Garcia*, 954 F.2d 12, 15 (1st Cir.1992)). In determining the drug amount, a "sentencing court may rely on reasonable estimates and averages." *Id.*; *United States v. Ortiz-Torres*, 449 F.3d 61, 79 (1st Cir. 2006).[8] When making drug calculations and attributing drug weight based on witness testimony, the Court must undertake a credibility assessment for each witness upon whose testimony the Court relies. *See United States v. Pizzarro*, 772 F.3d 284, 300 (1st Cir. 2014) ("district court's credibility assessments must be based on the whole record for all witnesses on whose testimony the court has relied to calculate the conspiracy drug quantity foreseeable"). In this case, the Court can readily credit all the witnesses who testified as to drug weight being substantial, because all of their testimony was corroborated by text messages with the Defendant.

However, this top-of-the-chart drug weight does not turn on witness credibility. In fact, Probation's calculation was predicated solely upon a selection of the text messages introduced in evidence at trial. Probation, however, did not even consider the kilograms of drug weight testified to by the witnesses or the exponential increase of that drug weight described by CW-6 who was one of the Defendant's dealers and someone involved in adulterating the drugs, conducting the deliveries, making drug sales, and maintaining an active drug ledger with the Defendant via text communications.[9] Probation's drug weight also does not account for the adulterated drug weight that was undertaken at the Defendant's direction, which would have multiplied the raw weight by about three. *See* PSR ¶¶92, 101. There were also pictures of fentanyl and cocaine in text message communications that Defendant provided to his dealers, which Probation also chose to not include in its calculation. *See* PSR ¶¶97, 115.

---

[8] See *United States v. Santos*, 357 F.3d 136, 141 (1st Cir. 2004)) ("[t]he district court's finding as to the amount of drugs reasonably foreseeable to [a defendant] need only be supported by a preponderance of the evidence and need not be exact so long as the approximation represents a reasoned estimate").

[9] When making drug calculations and attributing drug weight based on witness testimony, the Court must undertake a credibility assessment for each witness upon whose testimony the Court relies. *See United States v. Pizzarro*, 772 F.3d 284, 300 (1st Cir. 2014) ("district court's credibility assessments must be based on the whole record for all witnesses on whose testimony the court has relied to calculate the conspiracy drug quantity foreseeable to Pizarro"). In this case, the Court can readily credit all the witnesses who testified as to drug weight being substantial, because all of their testimony was corroborated by text messages with the Defendant.

As a result, Probation's drug weight calculation is exclusively comprised of drugs that the Defendant described in text messages sent or received from other participants in the conspiracy (suppliers, runners, and dealers he supplied) that were admitted at trial. This is far beyond preponderant evidence and suffers from no questions of credibility. While the government believes the drug weight is extremely understated, the text messages and seized drugs are certainly sufficient for this Court to affirm Probation's calculation and overrule the Defendant's objection.[10]

### E.    Leadership Role

The 4-point adjustment for leadership was properly applied by Probation. This enhancement requires a district court to make "both a status determination -- a finding that the defendant acted as an organizer or leader of the criminal activity -- and a scope determination -- a finding that the criminal activity met either the numerosity or the extensiveness benchmarks established by the guideline." *United States v. Tejada-Beltran*, 50 F.3d 105, 111 (1st Cir. 1995); *United States v. Arbour*, 559 F.3d 50, 53 (1st Cir.2009).

The guideline commentary provides a non-exhaustive list of factors for courts to consider when making the status determination. U.S.S.G. § 3B1.1(a) n. 4. These factors include:

> (1) the exercise of decision-making authority;

> (2) the nature of participation in the commission of the offense;

> (3) the recruitment of accomplices;

> (4) the claimed right to a larger share of the fruits of the crime;

> (5) the degree of participation in planning or organizing the offense;

> (6) the nature and scope of the illegal activity; and

> (7) the degree of control and authority exercised over others.

*Id.* "There need not be proof of each and every factor before a defendant can be termed an organizer or leader." *Tejada–Beltran*, 50 F.3d at 111.

---

[10] CW-6 and CW-14 described a drug weight far greater than that found by Probation.

As the First Circuit has noted, "'[a] defendant acts as a leader if he or she exercises some degree of dominance or power in a criminal hierarchy and has the authority to ensure that others will follow orders" and that "[a] defendant qualifies as an organizer if he or she coordinates others so as to facilitate the commission of criminal activity." *United States v. Monteiro*, 871 F.3d 99, 116 (1st Cir. 2017). Similarly, "[t]o qualify as an 'organizer,' the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime.'" *United States v. Poliero*, 81 F.4th 96, 99-100 (1st Cir. 2023).

Here the Defendant was both a leader and organizer, and all of these factors are present. Multiple cooperators and text messages demonstrated that the Defendant had almost exclusive decision-making authority. *See* PSR ¶¶24-28. The Defendant arranged the purchase of the drugs, their delivery up to Maine, dictated the methods by which the drugs would be adulterated, and how much would be provided to the dealers. *See* PSR ¶¶24-28, 67-69, 71-85. The Defendant also maintained the ledgers of what amounts were provided and how much was owed by the numerous dealers that he was supplying on consignment. There were even disputes over text messages between Coleman and Tejada about the Defendant's leadership style, how abrasive, he was and how poorly he treated Coleman. *See* PSR ¶28. The text messages showed the Defendant giving orders and setting timetables for his dealers and runners. *See* PSR ¶¶71-158, 192. Tellingly, Oth, a much older and senior TRG member, described (in a video recording) his difficulties in selling in Maine and the Defendant's successes, and deferred to the Defendant regarding the distribution of the three pounds of methamphetamine at his home -- he was holding it for the Defendant.

Another salient aspect of his leadership is that the Defendant retained the lion's share of the proceeds, and was paid first. *See* PSR ¶¶21-22, 75 (describing exchange between the Defendant and CW-14, where the Defendant was to be paid first and receive a larger amount). There is no question that the criminal activity had over five members. There were more than five dealers being supplied by the Defendant (CW-6, "Jenn Center", "Sarah D", "Sarah Hubby", "Jackie" and "Lucky"). There was also CW-2, the gun supplier who testified at trial, and the multiple runners that the Defendant had, including Coleman. From all

this, there is no question that the Defendant was a leader and an organizer, and that the criminal activity had more than five members. Consequently, the 4-level adjustment was properly determined by Probation.

## II.     THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553 REQUIRE A SIGNIFICANT SENTENCE OF 360 MONTHS

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). Among those factors are the "nature and circumstances of the offense" and the history and characteristics of the Defendant. *See* 18 U.S.C. § 3553(a)(1). The sentence must also "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." *See* 18 U.S.C. § 3553(a)(2)(A). There must also be a consideration of whether the sentence affords "adequate deterrence" for both the defendant and others. *See* 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct"). Lastly, the sentence must protect the public from the further crimes of the Defendant. *See* 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes of the defendant"). In this case, consideration of the § 3553(a) factors reveals that a sentence of 360 months, followed by 360 months consecutive is sufficient, but not greater than necessary, to meet the goals of sentencing.

### A.     Nature and Circumstances of the Offense

The nature and seriousness of this case cannot be overstated and speak precisely to the type of case that merits a sentence of no less than 720 months. The Defendant ran a sprawling and extensive drug enterprise that not only moved a significant quantity of drugs, but was just as focused upon street violence, shootings, threats, and perpetuating gang rivalries.

#### 1.  Drug Weight

The drug weight found by Probation is plainly understated and conservative. As the witnesses testified, and the text messages proved in plain English, this DTO moved well over 10 kilograms of fentanyl, 10 kilograms of cocaine, and 10 kilograms of methamphetamine. Not only are these 10 kilograms per drug type fully substantiated in writing, this is, by all accounts, an extremely conservative estimate of the amount

of fentanyl, cocaine, and methamphetamine that the Defendant introduced into communities in Maine.[11]

The sense of scale was also proven by the evidence. The Defendant was supplying multiple dealers with quarter to half-kilograms of each drug type every week for well over eight months. He made hundreds of thousands of dollars bringing drugs up to Maine, profiting from the work of his dealers who would undertake the effort to adulterate, distribute and collect the money. Then, when the Defendant received the cash, he promptly spent it on himself, buying jewelry, watches, clothing, jackets, and luxury items at high-end retailers.

Another aspect of this case that merits discussion is that this outrageous quantity of drugs was distributed by the Defendant, and he routinely interfaced with the actual users of the drugs. Put another way, this conspiracy did not entail arms-length transactions between persons engaged in wholesale supply multiple rungs above the average street user. Rather, the Defendant was up close and personal with the destruction he was causing in the lives of others – the persons whose addictions he fed and from whom he made his profits. The Defendant and his gang members mocked the people whose addictions they profited from by calling them "fiends." And the Defendant and his conspirators did not care that the drugs they were supplying were killing their employees, so long as the dealers paid him. To be this close to the ravages of drug addiction and to see only profit, betrays a deep failure of the human condition that must be met with incarceration.

The Court heard at trial from two of the Defendant's coconspirators, who were themselves drug users that the Defendant supplied. The Defendant profited off their misery and took advantage of them. CW-6 described this in detail: "He wanted me to try the Fentanyl to see if it was a good mix of cut and Fentanyl to see if it was good." Tr. 6/23/23, p. 213. He then would supply CW-6 with fentanyl and other drugs so that CW-6 could test some of it, adulterate most of it, sell it, and pay him for the privilege. CW-6's addiction grew to the worst it had ever been. *See* Tr. 6/27/23, p. 30 ("How were you doing in terms of your drug

---

[11] CW-6 described how the Defendant directed the process of cutting the drugs, providing instructions to add 10 grams of cut to 3 grams of fentanyl – effectively turning every 3 grams of fentanyl delivered by the Defendant and his runners into 13 grams.

addiction in February 2021? A. Probably the worst I'd ever been."). With the benefit of sobriety, CW-6 described his/her life working for the Defendant: "Awful. It was bad. It was bad. People got hurt. I got hurt. Just -- it was all bad. It was all violent things that happened to me that year." Tr. 6/27/23, p. 73. CW-6 was living a better life in jail than what he/she lived while working for the Defendant.[12]

The same was true of CW-2, who was clean when he/she met the Defendant and Coleman.  After becoming their Uber driver, Coleman and the Defendant soon started selling CW-2 drugs, and exploited CW-2 to obtain firearms, for which CW-2 received drugs.  *See* Tr. 6/13/23, p. 146 ("How did meeting them affect your sobriety? I started doing drugs again."). In short order, CW-2 became addicted to fentanyl, and crack cocaine and was "Smoking pot, crack cocaine, heroin, Fentanyl, things like that" on a daily basis. Tr. 6/13/23, p. 98.

Overall, the trial testimony, PSR, and videos admitted in evidence provides the Court with a glimpse into the staggering amount of deadly drugs that this Defendant sold.  He was proximate to the misery and death he was delivering, but saw only profits, luxury goods, and other personal aggrandizement.

### 2.  Profits

The Defendant generated hundreds of thousands of dollars for himself.  He reveled in the money he made – posting numerous videos where he possessed more than $10,000 or $20,000 and flaunted the numerous pieces of diamond-encrusted jewelry that he accumulated. This included multiple chains, one of which was stolen by rival gang members, and another which the government seized.  *See* PSR ¶¶22, 178-179.

---

[12] *See* Tr. 6/27/23, p. 73 ("It's better. I have a happy life. I have -- even though I'm behind bars, I'm still doing good. I'm participating in programs. I have a job. I'm saving money.").

 

For the chain that was stolen, the Defendant and Oth planned to retaliate and "hurt" the rivals who took the chain. *See* PSR ¶46.   The Defendant soon bought more. For these new pieces, he paid $20,000 cash for a diamond-encrusted watch and chain, and was to pay another $20,000 when the chain was completed. *See* PSR ¶60. The government seized both. Receipts recovered from the Defendant's residence showed that the Defendant would spend over $10,000 in a single day at luxury retailers on multiple occasions – quickly spending the drug money on extravagances, while his dealers fell further into their addictions.

The Defendant's dealers also accumulated extremely large drug debts. The Defendant would report those running debts in text messages. For example, after one delivery CW-6 owed the Defendant $115,000 for only 235 grams of fentanyl.  "Jenn" owed the Defendant $14,400 for one delivery. *See* PSR ¶139. Another dealer had a $33,000 bill owed after a single delivery. See PSR ¶149. A third owed over $25,000.  *See* PSR ¶154.  Considering the weight of fentanyl that the Defendant actually provided to CW-6, and the multiple other dealers, the Defendant earned hundreds of thousands of dollars and potentially more than a million dollars.  There was no altruism in this success – only pressure and threats when debts were not paid.

### 3.   The DTO and Defendant's Role

After Carlisle's arrest for murder in July 2020 the Defendant took over the DTO.  As Oth described on the recording, Carlisle's leadership was ineffective and not profitable – but the Defendant was making an obscene amount of money.

The Defendant's drug trafficking organization is remarkable in that he continued to deal large quantities despite the repeated arrests of its members and obvious law enforcement attention. Klein Ulysse was arrested in July 2020, and the DTO kept going. Carlisle was also arrested -- for murder no less -- and the DTO only became more efficient with the Defendant firmly in charge. *See* PSR ¶¶58-59. Coleman was arrested in January 2021, for a machinegun, and the Defendant continued to earn obscene profits, and deliver significant quantities to his dealers. Oth's residence was then searched in March 2020, multiple pounds of methamphetamine and two firearms were recovered, and he was federally charged in April 2020 – this too did not stop the Defendant. *See* PSR ¶38-40. Finally, the Defendant's residence was also searched by Federal authorities in March 2020, with no drugs recovered. Rather than stop or even pause the drug trafficking, the Defendant simply kept dealing, and was in the midst of a drug run to Maine when arrested in April 2020.

From this sequence, it is clear that the Defendant is the central and organizing figure for this TRG drug conspiracy. Despite the arrest and incarceration of four of his conspirators in seven months, the Defendant was still able to source large quantities of drugs, arrange for their delivery to supply the numerous dealers under him, and collect the proceeds. This is the Defendant's DTO, he ran it, controlled it, and profited from it. He must be held accountable for it.

### 4. Violence and Weapons

The Defendant is responsible for seven serious acts of violence – six shootings with Coleman, two shootings with Carlisle and Coleman, and the murder committed by Carlisle that was reasonably foreseeable. While the drug weight and machinegun drive the offense level, the firearms and violence merit specific consideration.

### a. Shootings & Murder

This Court should also focus its sentencing determination upon the wanton violence that this Defendant participated in while running the DTO. As noted above, at trial the Court heard about six shootings that the Defendant participated in with Coleman, Carlisle, and Ulysse. These shootings targeted rivals, were conducted to protect their drug proceeds and themselves, and otherwise bring violence to the street and increase their reputation. In this case, the Defendant's violence stands out, even against the

18

outrageous quantity of drugs that was distributed.

Remarkably, it does not appear that the Defendant or Coleman ever actually struck anyone with their gunfire. But there does not need to be a victim for a sense of danger and despair to pervade a neighborhood once it is shot up. Visitors avoid areas afflicted by gun violence, they stop patronizing businesses and communities can quickly decline through the fear instilled in residents and departure of those who do not wish to be victimized. Communities deserve far better than their streets and parking lots to serve as the backdrop of gang disputes and fully automatic gunplay. They also deserve those offenders who are duly convicted of destroying the communities' sense of safety to face stiff consequences and lengthy jail terms.

That Carlisle and the other TRG members who participated in the drug conspiracy struck five individuals, murdering one, in a single drive-by shooting demonstrates how fortuitous the circumstances of the Defendant's six shootings truly were. Any one of the six shootings could have had the same result. As CW-14 explained at trial, the Defendant, Coleman, and Carlisle had all fired at Trinitarios gang members two times in the past. CW-1 had heard the Defendant describe committing three shootings, which in context, includes the two shootings targeting the Trinitarios. This makes clear that the murder of the rival Trinitarios was something for which the TRG drug conspiracy armed themselves, practiced for, and expected of each other.

This murder sets this case apart, and it should factor into the sentence that the Defendant receives. This was the result he sought in the prior shootings, and it was eminently foreseeable that one of his close conspirators would complete the job he attempted to do twice before. In short, violence of this nature merits a punishment measured in decades, and the Defendant has certainly earned 720 months.

### b.  July 2, 2020, Machinegun Shooting

Apart from the murder, the most disturbing act of violence is the July 2, 2020, shooting where the Defendant and Coleman brought two firearms, including one of the DTO's fully automatic handguns to a housing project in Cambridge. They sprayed 30 rounds into a residential housing project filled with people. The audio recording from the ShotSpotter system tells the tale and demonstrates the chilling firepower and brazen violence that this Defendant and his DTO was responsible for.

It bears further emphasis that the Defendant is personally responsible for three shootings in four months. For this Defendant, more so than any other in this case, the Court must be guided by consideration of the shooting victims, the citizens whose neighborhoods were the scenes of senseless violence, and the families whose homes, vehicles and sense of security were destroyed by the Defendant's meaningless gunfire.

### 5. Conclusion

From all this, the Court can discern the necessity of a 60-year sentence. The evidence in this case was beyond overwhelming, and largely in writing from the Defendant's own text messages, and on video and in photographs. Multiple cooperating witnesses explained the centrality of the firearms and violence to this drug conspiracy. This Court is not sentencing based on conjecture or speculation. Rather, the violence, drug weight, firearms, and prevailing sentiment of the Defendant about these crimes was proven at trial in a vivid clarity: this is his life and who he is. He should be sentenced accordingly.

Though this is the Defendant's first adult felony conviction, the facts of the offense reveal that it comes as a result of a nearly unparalleled campaign of drug dealing, violence, injuries and murder that were the product of TRG and the Defendant's membership and leadership. The violent incidents distinguish this case from those where a firearm is merely possessed in connection with large drug quantities. Numerous people were shot, shot at, one was murdered, and entire communities suffered the effects of what this Defendant and his conspirators did over a two-year period. Consequently, a variant sentence to the mandatory minimum 40-years would not account for the requirements of the sentencing factors.

TRG's prior efforts to intimidate the state's cooperating witness (PSR ¶¶32-35), and efforts to disseminate information about cooperating witnesses in this case (PSR ¶36), in the government's estimation, reflects of lack of acceptance of responsibility that distinguishes this Defendant from deserving any leniency. In a chilling message displayed during trial before this very Court, the Defendant elected to wear a grey shirt during CW-14's testimony, flaunting the gang colors of TRG to CW-14 and reminding CW-14 of the Defendant's allegiances. The Defendant's loyalties lie with this gang and must bear the consequences of the crimes that are within the conspiracy committed by his fellow gang members.

**B.    History and Characteristics of the Defendant**

The government acknowledges that this is the Defendant's first felony conviction, and first sentence of any length.  In most circumstances, this might be a basis to consider a sentence below the GSR.  Upon scrutiny, this is not such a case, and this is not such a Defendant.

**1.    Gang Membership**

The Defendant's membership in TRG is not some passing phase. As his tattoos make clear, the Defendant has committed to TRG for life.  His tattoos include: the Raider's logo, which is a TRG symbol; a Playboy bunny on his hand that identified him in multiple videos, which is a TRG symbol; the cipher "7126" which reflects letters "T" (7) "R" (12) and "G" (6); and "EBK", which stands for "Everybody Killer", a designation among certain gangs such as TRG that they are not aligned with particular national alliances, such as "Folk Nation" or "People Nation," and will murder rivals on either side. Inexplicably, Probation neglected to include the most significant and prominent TRG tattoo on the Defendant's body: the gang signs for TRG spelled out in fingers across the Defendant's chest, with the words "Rascal Love" along the fingers. The government reproduces it here:



These tattoos are extensive and reveal the Defendant's character, motivations, and underlying loyalties – they are bound up with TRG. They demonstrate the Defendant's deep commitment to the gang, its lifestyle, and its crimes.  They also signify a commitment by the Defendant to the tenets of the gang,

which include the commission of murder, shootings, drug trafficking, and the overall destruction of any community that they find themselves in.

The Defendant offers essentially nothing in mitigation of this crime. He has made no contributions to society, and done very little with life except squander opportunities for education and rehabilitation, commit crimes while under court and parole supervision, evade responsibility for any of his actions, while wholeheartedly embracing the lifestyle of a gang member. While detained in this case, the Defendant remained in contact with Carlisle and Oth. In fact, during a recorded call, the Defendant and Carlisle discussed working together to identify the witnesses who would be testifying against them. And then, as noted, Tejada and Oth both had copies of the grand jury testimony of the state's cooperating witness on their phone. This is in addition to the Defendant purposefully wearing a gray shirt, which is TRG's color, during CW-14's testimony. *See* Tr. 6/16/23, p. 18; PSR ¶18. All this activity demonstrates that the Defendant is in no way remorseful for his conduct, and has no plans to separate himself from the gang, its members, or its violence. With his continued criminality all but forecast by his conduct, tattoos and significant violent conduct, a severe punishment is warranted, one that is no less than the low-end of the GSR.

### 2. The Defendant's Juvenile Criminal History

This Court must also consider the fact that the Defendant engaged in the same drug and violent crimes as part of the same violent street gang over a period of years. *See* PSR ¶258. The Defendant has accrued six criminal history points as a juvenile, which is remarkable.

- The Defendant first conviction related to an incident that took place when he was 15, for disturbing school by punching lockers and yelling profanity. *See* PSR ¶255. This case was continued without a finding, but the Defendant violated probation repeatedly and refused to meet with probation or counselors. The Defendant violated probation on this case by committing new offenses.

- Then the Defendant decided to vandalize a pool in a local housing project. *See* PSR ¶256. The Defendant was extremely disrespectful to officers and placed under arrest for trespassing. Again, this case was continued without a finding, despite the Defendant then being on release for earlier offenses. The Defendant violated probation on this case by committing new offenses.

- The Defendant then was involved in another incident at school where he was yelling at staff, spitting on his desk, and pushed a school resource officer who was trying to intervene. *See* PSR ¶257. Again, the case was continued without a finding, despite this being one of a number of open cases at the time. The Defendant violated probation on this case by committing new

offenses.

- Following, the Defendant and the state's cooperating witness were charged together in 2015, when the Defendant was fifteen. See PSR ¶256. That was a reported armed robbery of a taxi driver with a broken bottle. The Defendant's case was pled down and he was found delinquent. The Defendant violated probation on this case by committing new offenses.

- After being on probation from the armed robbery case for only about one month, the Defendant was arrested for carrying a firearm. *See* PSR ¶¶259-260. The Defendant had the firearm in his backpack. He was found indicted as a youthful offender, and adjudicated delinquent on December 22, 2016. The Defendant was sentenced to be committed the Department of Youth Services ("DYS") until the age of twenty-one, which was December 22, 2020. The Defendant was not actually held in DYS custody on this sentence for long, and appears to have been paroled shortly thereafter (he would participate in the charged offenses in this case from 2019 through 2020, and also was repeatedly arrested for motor vehicle and felony offenses in 2018, 2019, and 2020). *See* PSR ¶¶269-271.

Those are just his arrests that resulted in convictions. There were six other arrests of the Defendant, resulting in a total of twelve arrests by the age of 21, with a commitment to DYS providing a gap in 2017. *See* PSR ¶¶255-271. Moreover, he committed the instant offense – committing multiple shootings, and leading a multi-kilogram drug organization -- while on Parole from the Department of Youth Services.

### C.    Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment for the Offense

A sentence of 720 months is also necessary in order for the sentence to reflect the seriousness of the offense. The DTO was sophisticated and longstanding, and the drug weight at issue here is at the top of the chart. The violence is also extraordinary in terms of committing six shootings, including a murder that was foreseeable to the Defendant and committed by another conspirator, and the Defendant's participation in six shootings, including a machinegun shooting. All of this during the course of the DTO's operation, all while the Defendant was on parole.

The murder has been previously discussed above. It truly is the fulfillment of the murderous intentions that the Defendant exemplified in the other two shootings, where he, Carlisle, and Coleman targeted the Trinitarios in the past. That Carlisle and the other TRG members undertook another shooting of who they believed were Trinitarios and happened to strike them, was directly foreseeable and entirely within the scope of this drug conspiracy. After committing the murder and hitting four other believed-Trinitarios,

Carlisle in fact went directly to the Defendant to report his success in their mutual endeavor. *See* PSR ¶¶233-236. The Defendant's relationship to the acts that led up to the murder, and his participation in the TRG conspiracy before, during and afterwards, all demonstrate that he should face a penalty for his role in it.

### D.    Deterrence and Proportionality

General deterrence must also be considered, and this Court should be mindful of the message that this sentence will send to drug traffickers of this magnitude, and violent offenders who brazenly target others. A 720-month sentence imposed in the context of this case (after trial where overwhelming evidence of guilt was adduced over three weeks), sends a resounding message to large-scale drug distributors, gang members, and violent offenders across the District. That message is simple: detention, separation from the community and imprisonment for well-over five decades in a federal prison await them if they choose to deal drugs at this scale, and commit wanton violence with machineguns. And in the government's estimation, it is a message that will reverberate through the community of drug dealers and gang members due to the prominence of this Defendant among those offenders in this District.

Specific deterrence to this Defendant and other members of the DTO would also be well served by a 720-month sentence. In contrast to the Defendant's prior experience in state court that did nothing in the realm of deterrence, a 720-month sentence in this case will specifically deter this Defendant from crimes in the future through simple incarceration. After release, further punishment will await him if he reoffends or returns to drug dealing.

### E.    Public Protection

As a final and paramount factor, the Court must protect the public from drug traffickers and violent offenders such as this Defendant for as long as the statutory considerations will permit. Given the timeline of violence and scope of drug dealing, all of which took place while the Defendant was actually on parole for an armed robbery and firearm offenses, this Court can be assured that only incarceration will protect the public in the future. This Court should ensure that for 720 months the Defendant cannot destroy more lives through fentanyl, methamphetamine, and the acts of senseless violence that were the Defendant's hallmark.

III.    **RESPONSE TO PROCEDURAL ORDER**

In response to the Court's procedural order (ECF #307), the government states as follows:

a.   The government is seeking a sentence with the guidelines;

b.   The government does not believe that there are no legal questions not adequately addressed in the presentence report; and

c.   The government does not believe that there are factual issues, which require an evidentiary hearing.

## CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence the Defendant to a term of imprisonment for 720 months, followed by five years of supervised release.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:    */s/ Philip A. Mallard*
PHILIP A. MALLARD
KAITLIN R. O'DONNELL
Assistant U.S. Attorneys
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3674

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Philip A. Mallard*
PHILIP A. MALLARD
Date:    January 27, 2024                    Assistant U.S. Attorney